IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,544

POWERBACK REHABILITATION, LLC,
*Appellee,*

v.

KANSAS DEPARTMENT OF LABOR,
*Appellant.*

SYLLABUS BY THE COURT

1.

When determining whether state law is preempted by a federal regulation, a court must conduct its own conflict analysis based on the regulatory text. Regulatory preambles are insufficient to establish a conflict.

2.

When a federal law permits, but does not require, action by a private party, there is generally room for the state to prohibit that action—in this case, inquiring into religious sincerity.

Appeal from Johnson District Court; DAVID W. HAUBER, judge. Oral argument held April 2, 2025. Opinion filed September 26, 2025. Reversed and remanded.

*Dwight R. Carswell*, deputy solicitor general, argued the cause, and *Anthony J. Powell*, solicitor general, *Kurtis K. Wiard*, assistant solicitor general, and *Kris W. Kobach*, attorney general, were with him on the briefs for appellant.

*Melody L. Rayl*, of Fisher & Phillips LLP, of Kansas City, Missouri, argued the cause, and *Lauren M. Sobaski* and *Robert A. Wasserman*, of the same firm, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: The controversy in this case goes to the heart of our federal system of separate sovereigns and the relationship between them as each seeks to regulate society and protect individual rights. This is sometimes referred to as "'the delicate balance of federal and state power.'" *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1306 (2d Cir. 1990). Like so many recent disputes over the scope of governmental power, this case arises out of the COVID-19 pandemic. It stems from a religious liberty exemption granted to prospective employees by the State of Kansas to any prospective employer's vaccination policies.

Katlin Keeran received an offer to work for Powerback Rehabilitation, LLC (Powerback) as an occupational therapist. But Powerback rescinded the offer after it denied Keeran's request for a religious exemption to its employee vaccine requirement. The offer was contingent on proof that Keeran was fully vaccinated against COVID-19— or had received an exemption from vaccination under Powerback's policy. There is no dispute in this case that Powerback's vaccination policy (including the available exemptions and process for receiving one) complied with federal law but violated Kansas law. So, simply put, this case asks us to resolve the question—which law must Powerback follow? We hold the two regimes are not in conflict, thus Powerback must comply with both.

FACTUAL AND PROCEDURAL BACKGROUND

During the application process, Keeran completed Powerback's religious accommodation request form. On it, she stated "I believe in seeking alternatives to vaccines made using cell lines from aborted fetuses." She also submitted a letter in support of her request from her friend Beth Oswald. The letter stated that Oswald knew

2

that Keeran "has a religious objection to the vaccine due to fetal cells being using [*sic*] in the development stage to create the vaccine. Psalms 139 supports the religious objection."

Powerback's human resources department followed up with Keeran's request by asking her when she had last received a vaccine of any kind. Keeran replied that her last vaccination was for influenza, but she did not know when it was. When Powerback asked her for a guess, Keeran estimated it had been two or three years since she had received that vaccination. In later correspondence Keeran stated "I am not familiar with this [COVID-19] vaccine, but I decline to receive it as I am not familiar with it." Based on these responses, Powerback deemed Keeran's religious conviction insincere; denied Keeran's accommodation request pursuant to their policy; and withdrew the employment offer.

Keeran filed a complaint with the Kansas Department of Labor (KDOL), which found that Powerback had violated 2021 Special Session House Bill 2001 (L. 2021, ch. 1, § 1 [special session], now codified at K.S.A. 2024 Supp. 44-663 et seq.), by inquiring into the sincerity of Keeran's religious beliefs. The law requires employers who implement a COVID-19 vaccine requirement to grant exemptions on religious grounds. Under the legal framework, employees seeking a religious exemption must submit a written waiver request attesting that receiving the COVID-19 vaccine would violate their sincerely held religious beliefs. Employers then must grant the exemption without inquiring into the sincerity of the religious belief. K.S.A. 2023 Supp. 44-663(a)-(b).

Powerback sought judicial review of the agency's determination. The district court granted review and reversed the agency's decision. The district court held that K.S.A. 2023 Supp. 44-663 was preempted by conflicting federal law, namely, the Department of Health and Human Services' interim final rule, Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination (hereinafter Vaccine Mandate), 86 Fed. Reg. 61,555-01, 61,626 (Nov. 5, 2021) (to be codified at 42 C.F.R. pts. 416, 418,

441, 460, 482-86, 491, and 494). The Vaccine Mandate established COVID-19 vaccination requirements for the providers and suppliers of comprehensive rehabilitation programs that receive money from Medicare and Medicaid. In general, all staff were to be fully vaccinated from COVID-19. See 86 Fed. Reg. at 61,622-23. Because Powerback receives Medicare and Medicaid funding, it was subject to the Vaccine Mandate as a condition for receiving those dollars. (As an aside, the Vaccine Mandate was later withdrawn. Medicare and Medicaid Programs; Policy and Regulatory Changes to the Omnibus COVID-19 Health Care Staff Vaccination Requirements, 88 Fed. Reg. 36,485-01, 36,502 [2023] [to be codified at 42 C.F.R. pts. 416, 418, 441, 460, 482-86, 491, and 494], ["In this final rule, the substantive provisions of the staff vaccination [interim final rule] are withdrawn."].). The district court relied on both the express preemption statement in the Vaccine Mandate's preamble, as well as the preamble's incorporation of Title VII religious accommodation standards in finding federal law preempted K.S.A. 2023 Supp. 44-663.

The district court further held that K.S.A. 2023 Supp. 44-663 violated due process because it lacked a rational basis. *Powerback Rehabilitation, LLC v. Kansas Dept. of Labor*, No. 23-CV-1681 (Kan. 10th Jud. Dist. Ct. Jan. 30, 2024) ("It does not meet the rational basis test for its justification based on its hasty passage and baseless invocation of the unconstitutionality of federal vaccination law to justify the same."). The district court declined to address any other issues raised by the parties. The KDOL directly appealed to this court via K.S.A. 60-2101(b) based on the district court's ruling that K.S.A. 2023 Supp. 44-663 is unconstitutional.

ANALYSIS

The Kansas Judicial Review Act (KJRA), K.S.A. 77-601 to 77-631, governs our review. The KJRA provides relief if the statute on which the agency action is based is unconstitutional on its face or as applied. K.S.A. 77-621(c)(1). Legal questions are

4

reviewed de novo, while factual questions are reviewed under a substantial competent evidence standard. *EagleMed v. Travelers Insurance*, 315 Kan. 411, 419-20, 509 P.3d 471 (2022). This case presents pure questions of law.

The KDOL contends that any conflict between K.S.A. 2023 Supp. 44-663 and the Vaccine Mandate or Title VII is illusory. It also argues, for the first time on appeal, that the Vaccine Mandate exceeded Congress' spending power. In our discretion, and because it is unnecessary to resolution of this appeal, we decline to address the spending power argument for the first time on appeal. *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020).

It is a general principle of our federal system of government that when the laws of a state conflict with federal law, federal law controls. U.S. Const. art. VI, cl. 2. See also *Murphy v. National Collegiate Athletic Assn.*, 584 U.S. 453, 477, 138 S. Ct. 1461, 200 L. Ed. 2d 854 (2018) ("Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted."). This is called preemption. There are two kinds of preemption—express and implied preemption. And within implied preemption, there are two sub-categories—field and conflict preemption. See *Kansas v. Garcia*, 589 U.S. 191, 202-03, 140 S. Ct. 791, 206 L. Ed. 2d 146 (2020). Powerback argues that both express preemption and implied conflict preemption apply here.

As a matter of first principle, the United States Supreme Court will find an express preemption only when federal law explicitly uses words like "supersede," "preempt," or "preemption," or directly prohibits a state from applying a certain type of law. See, e.g., *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 90, 137 S. Ct. 1190, 197 L. Ed. 2d 572 (2017) (federal law preempting "'any State or local law, or any regulation issued thereunder, which relates to health insurance or plans'"); *Puerto Rico v. Franklin Cal.*

*Tax-Free Trust*, 579 U.S. 115, 123-27, 136 S. Ct. 1938, 195 L. Ed. 2d 298 (2016) (examining whether Puerto Rico is a "State" for purposes of an express preemption provision); *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319, 136 S. Ct. 936, 194 L. Ed. 2d 20 (2016) ("ERISA pre-empts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.'"); *American Trucking Assns., Inc. v. Los Angeles*, 569 U.S. 641, 646, 133 S. Ct. 2096, 186 L. Ed. 2d 177 (2013) ("'[A] State [or local government] may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.'"); *Sprietsma v. Mercury Marine*, 537 U.S. 51, 63, 123 S. Ct. 518, 154 L. Ed. 2d 466 (2002) ("Here, the express pre-emption clause in § 10 applies to 'a [state or local] law or regulation.' 46 U.S.C. § 4306. We think that this language is most naturally read as not encompassing common-law claims . . . ."). But see *Coventry Health Care of Mo., Inc.*, 581 U.S. at 99 ("[W]e do not require Congress to employ a particular linguistic formulation when preempting state law.").

Conflict preemption is more complicated and occurs when "'compliance with both federal and state regulations is a physical impossibility,' and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citations omitted.]" *Arizona v. United States*, 567 U.S. 387, 399, 132 S. Ct. 2492, 183 L. Ed. 2d 351 (2012). In the context of regulations issued by federal agencies, "an agency regulation with the force of law can pre-empt conflicting state requirements." *Wyeth v. Levine*, 555 U.S. 555, 576, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009). When determining whether a federal regulation preempts state law, courts perform their "own conflict determination, relying on the substance of state and federal law and not on agency proclamations of pre-emption." Furthermore, there is a presumption that state law has not been impliedly preempted in an area of law traditionally occupied by the states. 555 U.S. at 565. See also *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 715, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985).

As described above, K.S.A. 2023 Supp. 44-663(a)(2) prohibits an employer that implements a COVID-19 vaccine requirement from taking punitive action against an employee who submits a written waiver stating that the requirement would "violate sincerely held religious beliefs of the employee, as evidenced by an accompanying written statement signed by the employee." Furthermore, "[a]n employer shall grant an exemption requested in accordance with this section based on sincerely held religious beliefs *without inquiring into the sincerity of the request*." (Emphasis added.) K.S.A. 2023 Supp. 44-663(b). Employers who violate the law face civil penalties up to "$10,000 per violation for an employer with fewer than 100 employees" and up to "$50,000 per violation for an employer with 100 or more employees." K.S.A. 2023 Supp. 44-663(c)(3)(C)(i)-(ii).

In contrast, the Vaccine Mandate required most Medicare- and Medicaid-certified providers to vaccinate their staff against COVID-19. 86 Fed. Reg. at 61,556, 61,616-27. The Vaccine Mandate was prefaced by a long preamble. Such preambles are not part of the controlling regulation and are not authoritative law. See, e.g., *AT&T Corp v. Federal Communications Com'n*, 970 F.3d 344, 350 (D.C. Cir. 2020) ("The FCC contends that its explanatory statements, published in the Federal Register, should be treated as part of the binding regulation. It is mistaken."); *Peabody Twentymile Mining v. Secretary of Labor*, 931 F.3d 992, 998 (10th Cir. 2019) ("[W]hile the preamble can inform the interpretation of the regulation, it is not binding."). The preamble explained that the Vaccine Mandate required providers to "implement a process by which staff may request an exemption from COVID-19 vaccination requirements based on an applicable Federal law. . . . [R]eligious beliefs, observances, or practices, may provide grounds for exemption." 86 Fed. Reg. at 61,572. However, the Vaccine Mandate preamble further claimed that it "preempt[ed] the applicability of any State or local law providing for exemptions to the

7

extent such law provides broader exemptions than provided for by Federal law and are inconsistent with this [rule]." 86 Fed. Reg. at 61,572; see also 86 Fed. Reg. at 61,613. In those situations, the preamble explained

> "the agency intends that this rule preempts State and local laws to the extent the State and local laws conflict with this rule. The agency has considered other alternatives (for example, relying entirely on measures such as voluntary vaccination, source control alone, and social distancing) and has concluded that the mandate established by this rule is the minimum regulatory action necessary to achieve the objectives of the statute." 86 Fed. Reg. at 61,613.

Finally, the preamble explained that providers cited for noncompliance with the Vaccine Mandate could face the following consequences under applicable federal law: "civil money penalties, denial of payment for new admissions, or termination of the Medicare/Medicaid provider agreement." 86 Fed. Reg. at 61,574.

Throughout this litigation, Powerback has claimed an express preemption found in the preamble of the Vaccine Mandate. Powerback also argues that, even if this court were to find the preamble language insufficient for express preemption, the preamble language is evidence of the purpose of the Vaccine Mandate, and that K.S.A. 2023 Supp. 44-663 frustrates that purpose. Therefore, implied preemption would apply.

We decline to accept Powerback's say-so that the preamble is sufficient to expressly preempt state law. While the preamble may have some persuasive merit, *Wyeth*, 555 U.S. at 576-77, it does not, by itself, have the force of law demanding judicial deference. Regulatory preambles are generally not binding in other contexts. See *AT&T Corp*, 970 F.3d at 350; *Peabody Twentymile Mining*, 931 F.3d at 998. Therefore, when determining whether state law is preempted by a federal regulation, a court must conduct its own conflict analysis based on the regulatory text. Regulatory preambles are

insufficient to establish a conflict. And without the preamble, the text of the Vaccine Mandate itself does not expressly preempt state law. It includes none of the hallmarks of express preemption, and in that absence, we cannot presume an express intent to preempt.

We thus turn to implied conflict preemption and the two questions we must ask— is it impossible to comply with both the Vaccine Mandate and K.S.A. 2023 Supp. 44-663; and is Kansas law an obstacle to the accomplishment and execution of the full purposes and objectives of the Vaccine Mandate, which is a regulation within the statutory authority of the Health and Human Services Secretary? *Biden v. Missouri*, 595 U.S. 87, 92, 142 S. Ct. 647, 211 L. Ed. 2d 433 (2022) ("[W]e agree with the Government that the Secretary's rule falls within the authorities that Congress has conferred upon him."). If the answer to either of these questions is yes, then Kansas law is preempted.

Powerback's argument is simple and alluring at first blush. It simply points out that "federal law contemplates an inquiry into the sincerity of an employee's purported religious beliefs. [K.S.A. 2023 Supp. 44-663] specifically *disallows* this same inquiry. The Vaccine Act thus forces Powerback to make an impossible decision between compliance with Kansas law or compliance with federal law." But this framing of the problem incorporates a deft sleight-of-hand. Because federal "contemplation" is not a mandate. That is, nowhere in the federal regulations (or the preamble for that matter) is an employer subject to the Vaccine Mandate *required* to inquire into the sincerity of an employee's religious beliefs. At most, the employer is *permitted* to make this inquiry. See 86 Fed. Reg. at 61,568 (explaining in the preamble that providers must comply with Title VII); *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1012 (7th Cir. 2024) (noting the employer in a Title VII lawsuit "will be permitted to develop evidence that the beliefs in question are not 'sincere' or even 'religious'"). With this understanding, the conflict question appears in a very different light.

The Vaccine Mandate incorporates the exemption scheme set forth in Title VII—"[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a). And while Title VII may indeed permit an inquiry into the sincerity of religious beliefs (according to a scattered assortment of federal cases cited by Powerback), nowhere in Title VII is such an inquiry required. The plain language of Title VII does not require this inquiry into sincerity. And we know of no binding federal caselaw making such a rule—Powerback cites to none. In fact, questioning the sincerity of a religious belief is something courts are generally reluctant to do. See, e.g., *Passarella*, 108 F.4th at 1011 ("'[C]ourts should not undertake to dissect religious beliefs . . . because [they] are not articulated with the clarity and precision that a more sophisticated person might employ.'").

Thus, Powerback could have granted a religious exemption to Keeran that was consistent with both Title VII (as incorporated into the Vaccine Mandate) and with K.S.A. 2023 Supp. 44-663 by simply not inquiring into Keeran's religious sincerity. See 42 U.S.C. § 2000e-7 (Title VII "shall [not] be deemed to exempt or relieve any person" from obligations under "any present or future law of any State . . . , other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter."); *California Federal Savings & Loan Assn. v. Guerra*, 479 U.S. 272, 291 n.29, 107 S. Ct. 683, 93 L. Ed. 2d 613 (1987) ("We conclude that 'permit' in [42 U.S.C. § 2000e-7] must be interpreted to pre-empt only those state laws that expressly *sanction* a practice unlawful under Title VII.").

Thus, when a federal law permits, but does not require, action by a private party, there is generally room for the state to prohibit that action—in this case, inquiring into religious sincerity. When Congress creates "a regulatory floor" such as the protections for religious exemptions in Title VII—as opposed to a ceiling—states cannot weaken those protections, but they may strengthen them. See, e.g., *Capron v. Office of Attorney*

10

*General of Mass.*, 944 F.3d 9, 27 (1st Cir. 2019) ("floor-ceiling issue arises with some frequency in disputes over obstacle preemption" and unless Congress is "operating in a field of unique federal interest" courts apply "a presumption against construing the federal regulatory floor also to be a ceiling on state regulation"); see also *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 147-48, 83 S. Ct. 1210, 10 L. Ed. 2d 248 (1963) (federal food safety protections for avocados may be supplemented by more rigorous state standards); *Williamson v. Mazda Motor of America, Inc.*, 562 U.S. 323, 336, 131 S. Ct. 1131, 179 L. Ed. 2d 75 (2011) (absent evidence of congressional intent to create a regulatory objective, federal safety standards permitting lap seat belts in rear vehicle seats does not preempt states from requiring lap-and-shoulder seat belts in rear vehicle seats because "state tort law does not conflict with a federal 'minimum standard' merely because state law imposes a more stringent requirement" [quoting from and adopting the reasoning of the Solicitor General]). Thus, it was not impossible for Powerback to comply with both legal regimes, so the answer to the first implied conflict preemption question must be no.

The dissent rejects this conclusion on the grounds that Title VII's allowance of what the dissent characterizes as a "meaningful interactive process with the employee" is actually a "federally granted right" which state law cannot "nullify" or "forbid" an employer from exercising. See *Powerback Rehabilitation, LLC v. Kansas Dept. of Labor*, 321 Kan. ___, ___, slip op. at 25-26. If this were true, the dissent would be correct. But it is not true. Indeed, the dissent has dramatically misunderstood—and in fact inverted—Title VII. The statutory framework adopted by Congress in Title VII does not define or create any genuine "rights" in employers. It is instead entirely about protecting and preserving the rights of *employees* not to be discriminated against. See *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971) ("The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor" some employees over others.); *Albemarle Paper Co. v. Moody*, 422

U.S. 405, 417, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975) (The "primary objective" of Title VII is "a prophylactic one" to prevent discrimination in employment.); see also *Davis v. City of Springfield*, No. 3:22-CV-30011-KAR, 2023 WL 4976372, at *4 (D. Mass. 2023) ("Title VII, as amended, protects employees and job applicants from employment discrimination based on race, color, religion, sex, and national origin.").

Discriminating against employees because of their religious beliefs is not a *right* granted by Title VII—and it is bizarre for the dissent to suggest as much. It is true, as the dissent asserts, that Title VII balances the protections it provides to employees against the ability of employers (which existed before Title VII's enactment) to hire and fire whoever they want. But that does not mean that Title VII is cementing in law an employer "right" to exercise whatever discretionary, discriminatory power Title VII permits the employer to retain. That is, Title VII creates a "regulatory floor" in favor of employees and defines the minimum protections against discrimination by employers that employees enjoy under federal law. That floor is not, however, the final answer. States are free to *raise* the floor and provide additional protections against discrimination without running afoul of the Supremacy Clause. The dissent's reasoning is akin to claiming that because Title VII *permits* discrimination in employment against short people, a state is forbidden from enacting additional employment protections in favor of short people.

That leaves the second implied preemption question—is Kansas law an obstacle to the accomplishment and execution of the full purposes and objectives of the Vaccine Mandate? Notably, the Supreme Court has in recent history reversed a preemption holding by this court. In *Garcia*, the Supreme Court held that Kansas' identity theft statute was not preempted by 8 U.S.C. § 1324a with regards to illegal aliens providing false information on tax forms. 589 U.S. at 195-202. The court declared that "[t]he mere fact that state laws like the Kansas provisions at issue overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption."

12

589 U.S. at 211. And "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." 589 U.S. at 212.

Just so here. Powerback's argument boils down to hairsplitting—the two regulatory regimes exhibit different policy preferences (one favoring maximal vaccination and one favoring maximal protection of religious liberty) and thus the state exemption should be preempted. But the mere possibility that state and federal regulations pursue varying policy objectives is insufficient to frustrate the purpose of the federal regulation such that the regulation preempts an otherwise valid state law. The chance that an individual seeking a religious exemption *might* be insincere such that he or she would be entitled to protection under state, but not federal law is a tenuous basis on which to preempt a state law in an area traditionally governed by states—the health, safety, and wellbeing of citizens. See *Wyeth*, 555 U.S. at 565 ("'[W]e "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."'"). And that strained proposition seems especially dubious under the facts of this case—where Keeran submitted a statement from her friend quoting the Bible in support of her request and had not received any vaccinations in at least the last few years.

Essentially, to conclude that the purpose of the Vaccine Mandate would be frustrated by K.S.A. 2023 Supp. 44-663, one would have to accept the hypothetical parade of horribles implied by the district court—that K.S.A. 2023 Supp. 44-663 would result in waves of the irreligious and/or insincere religious observers claiming a sincere religious belief to cart blanche avoid vaccination. Thus frustrating the federal goal of promoting health and safety by having Medicaid- and Medicare-providers generally be fully vaccinated against COVID-19. Nowhere have these facts been remotely established, and we decline to entertain such wild speculation. The answer to the second implied conflict preemption question must therefore also be no.

13

Powerback makes two final attempts to defend its actions by claiming unique and slightly different forms of preemption from those discussed above. First, Powerback suggests compliance with state law places an undue hardship on it under Title VII. This is because Title VII permits an employer to deny a religious accommodation if doing so would result in an undue hardship on the employer. See 42 U.S.C. § 2000e(j) ("The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."). Powerback argues that the "undue hardship" it would have suffered were it to have granted Keeran's religious exemption is that it would have lost all its federal funding. In support, Powerback cites an executive directive by Governor Laura Kelly noting that any loss of Centers for Medicare and Medicaid Services funding for failure to comply with the Vaccine Mandate would result in the loss of services for Kansas veterans, elderly, and disabled.

But as demonstrated above, a sincerity inquiry is not *required* under Title VII. Given this, the alleged threat to Powerback's federal funding source is specious. And contrary to Powerback's argument, Governor Kelly's Executive Directive does not support the claim—the Executive Directive ordered relevant state agencies to comply with *both* the Vaccine Mandate and K.S.A. 2023 Supp. 44-663. See Executive Directive No. 22-550, Affirming State Law in Agency CMS Compliance, 41 Kan. Reg. 320 (2022). Thus, the hardship alleged by Powerback is effectively a nonissue. There is no evidence that Powerback denied Keeran a religious accommodation due to some other workplace hardship—it cited sincerity of belief alone as the basis for its denial in administrative proceedings.

Finally, Powerback argues that the definition of religion in Kansas is "broader" than under federal law. Powerback points to the definition of religious beliefs contained in K.S.A. 2023 Supp. 44-663 versus the definitions in federal regulations and Equal

14

Employment Opportunity Commission (EEOC) guidance. We are not convinced that this provides any additional substantive grounds for preemption. The state and federal definitions are practically identical. Compare 29 C.F.R. § 1605.1 (2025) ("[T]he Commission will define religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views."), and EEOC Compliance Manual § 12-I(A)(1) ("Religious beliefs include theistic beliefs as well as non-theistic 'moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.'"), with K.S.A. 2023 Supp. 44-663(d)(8) ("'[R]eligious beliefs' includes, but is not limited to, theistic and non-theistic moral and ethical beliefs as to what is right and wrong that are sincerely held with the strength of traditional religious views.").

State law is meaningfully different according to Powerback because the EEOC Compliance Manual gives additional specific guidance, such as—"Social, political, or economic philosophies, as well as mere personal preferences, are not religious beliefs protected by Title VII." EEOC Compliance Manual § 12-I(A)(1). Under Powerback's logic, federal law could de facto preempt even identical state law so long as the federal law referenced a guidance manual with more specifics. Given the Supreme Court's guidance that overlapping and potentially differing enforcement priorities do not provide a basis for conflict preemption, this argument is also unavailing. *Garcia*, 589 U.S. at 211; see *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 314, 139 S. Ct. 1668, 203 L. Ed. 2d 822 (2019) (noting that the "'possibility of impossibility' [is] not enough" for conflict preemption). Therefore, K.S.A. 2023 Supp. 44-663 is not expressly or impliedly preempted by the Vaccine Mandate or Title VII.

We now proceed to the district court's alternative holding—that K.S.A. 2023 Supp. 44-663 violates Powerback's due process rights. It appears the lower court's analysis was grounded in substantive due process, but the district court's opinion is somewhat unclear. The KDOL concedes that Powerback has a property interest in

15

avoiding fines imposed by the Vaccine Mandate, but the KDOL maintains that there is no procedural or substantive due process violation. On the other hand, Powerback argues K.S.A. 2023 Supp. 44-663 "violates both substantive and procedural due process by arbitrarily depriving facilities like Powerback of their property without reasonable notice and an opportunity to be heard."

Substantive due process protects a party from state action that is arbitrary or violates rights; procedural due process protects a party's opportunity to be heard in a meaningful time and manner. *State v. Genson*, 316 Kan. 130, 138, 513 P.3d 1192 (2022). The parties agree that the threshold requirement for either theory of a protected liberty interest is present here. See *Zen Group, Inc. v. Agency for Health Care Admin.*, 80 F.4th 1319, 1326 (11th Cir. 2023) ("Zen Group had at least a due-process right to challenge a $276,067.95 fine because the fine would deprive Zen Group of money *on top of* the recoupment of Medicaid payments for services rendered."); see also *Johnson v. State*, 289 Kan. 642, 650, 215 P.3d 575 (2009) (noting that the existence of a liberty interest is not in and of itself sufficient for a substantive due process violation); *In re Adoption of A.A.T.*, 287 Kan. 590, 600, 196 P.3d 1180 (2008) (procedural due process claim required showing of protected liberty interest).

"[P]rocedural due process requires the State to provide notice of a potential deprivation of the interest and an opportunity to be heard regarding the deprivation." 287 Kan. at 600. Furthermore, "[i]t is necessarily implied that both the notice and opportunity to be heard must be provided at a meaningful time and in a meaningful manner to comport with the constitutional guarantee." 287 Kan. at 600.

Powerback argues that it did not receive a meaningful opportunity to be heard but was rather faced with a choice regarding which legal regime it wanted to get penalized under. In substance, this constitutional argument mirrors exactly Powerback's preemption

16

claim. That is, if Kansas law did in fact conflict with federal law, it would both be preempted and—in theory at least—a violation of due process. This is a truism. States cannot legislate in conflict with federal law. The two claims will rise or fall together. And having determined that Powerback's preemption claim fails, so too must its constitutional claim.

It was not impossible for Powerback to comply with both state and federal law. The property interest Powerback relies on was not in any way threatened by compliance with Kansas law. Moreover, K.S.A. 2023 Supp. 44-663 did provide meaningful notice and opportunity to be heard. Powerback was given notice of the complaint and an opportunity to respond. Powerback had the opportunity to request a hearing. The KDOL was required to investigate and issue a final order within 60 calendar days of the complaint being filed. K.S.A. 2023 Supp. 44-663(c)(2)(A). And following this determination, Powerback was able to appeal the KDOL decision under the KJRA. K.S.A. 2023 Supp. 44-663(c)(2)(B). Thus, Powerback's procedural due process claim fails.

The district court did also appear to make a ruling that the state law violated substantive due process on its own merits, without any reference to federal law. The district court held that K.S.A. 2023 Supp. 44-663 did "not meet the rational basis test for its justification based on its hasty passage and baseless invocation of the unconstitutionality of federal vaccination law to justify the same." The lower court is correct that to be constitutionally valid, health and welfare laws must generally survive a rational basis review, which means that the law "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 301, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022).

But rational basis review does not require a timeline for legislative enactments—hasty or slow—nor does it require the legislative record to avoid critiques of the federal government or even expressly stated policy differences. The State of Kansas is a distinct sovereign from the federal government. Kansas must, of course, comply with the Supremacy Clause as is proper for its place in our federalist system of government. But as we have already explained, mere disagreement between a state and the federal government does not trigger preemption. Where the Supremacy Clause and preemption is not in play, as here, the only proper constitutional question is whether the Legislature had a legitimate interest—protecting religious liberty—and whether the law could serve that interest. Prohibiting an inquiry by an employer into the sincerity of a religious belief is clearly rationally related to protecting cherished liberty interests. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014) ("HHS and the principal dissent in effect tell the plaintiffs that their beliefs are flawed. For good reason, we have repeatedly refused to take such a step."). The statute in question easily survives a rational basis review.

Powerback raises additional arguments made below but not addressed by the district court. The court declines to address these arguments for the first time on appeal. See *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 81, 274 P.3d 609 (2012) (declining to rule on an issue that the district court did not rule upon). Powerback remains free to raise these arguments again at the district court.

The judgment of the district court holding that K.S.A. 2023 Supp. 44-663 is preempted by federal law and unconstitutional is reversed. This case is remanded for proceedings consistent with this opinion.

Reversed and remanded.

WILSON, J., not participating.

18

* * *

STANDRIDGE, J., dissenting: The Court today upholds K.S.A. 2023 Supp. 44-663 against a clear federal conflict. Under longstanding Supremacy Clause doctrine, state law must yield where compliance with both state and federal law is impossible, or where state law frustrates Congress' objectives. K.S.A. 2023 Supp. 44-663 fails on both counts. First, it creates an impossibility: employers cannot simultaneously comply with Title VII's balanced accommodation scheme and Kansas' mandate of automatic exemptions. Second, and independently, the Kansas law stands as an obstacle to the accomplishment of Congress' purposes. By stripping away Title VII's essential safeguards—the ability to question sincerity and to engage in a meaningful interactive process with the employee to determine whether a requested accommodation would impose undue hardship—the statute upends the equilibrium Congress deliberately struck. For these reasons, I dissent.

ANALYSIS

## I. *Statutory and regulatory background*

### A. *Vaccine Mandate*

In response to the COVID-19 pandemic, the Centers for Medicare & Medicaid Services (CMS) issued a federal "Vaccine Mandate" for applicable healthcare providers, to combat the spread of the virus. Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61,555-01, 61,626 (Nov. 5, 2021) (later codified at 42 C.F.R. pts. 416, 418, 441, 460, 482-86, 491, and 494). Pursuant to this rule, providers were required to ensure their staff were fully vaccinated against COVID-19, as a condition of participation in these federal programs. Providers were also directed to "establish and implement a process by which staff may request an exemption from COVID-19 vaccination requirements based on an applicable Federal law." 86 Fed. Reg. at 61,572.

19

B. *Title VII*

The phrase "applicable Federal law" plainly encompasses Title VII of the Civil Rights Act of 1964, which prohibits employers from discriminating against an individual because of that individual's religion. See Pub. L. 88-352, 78 Stat. 253, as amended, 42 U.S.C. § 2000e-2(a). Under Title VII, an employer engages in unlawful discrimination if it fails "to reasonably accommodate" an employee's religious belief, practice, or observance, unless the employer can show that such accommodation would result in "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

Federal law thus incorporates two distinct threshold inquiries: (1) whether the asserted belief is religious in nature, and (2) whether accommodating it would cause undue hardship. Both inquiries are firmly grounded in federal statute and supported by United States Supreme Court precedent.

With the first inquiry, the Supreme Court has explained that, while the government may not assess the truth or validity of a belief, it may examine "whether the beliefs professed by [an individual] are sincerely held and whether they are, in his [or her] own scheme of things, religious." *United States v. Seeger*, 380 U.S. 163, 185, 85 S. Ct. 850, 13 L. Ed. 2d 733 (1965). Courts have consistently applied this principle in the Title VII context. See, e.g., *Bushouse v. Local Union 2209*, 164 F. Supp. 2d 1066, 1074-76 (N.D. Ind. 2001) (relying on *Seeger*, 380 U.S. 163, and *Wisconsin v. Yoder*, 406 U.S. 205, 215-16, 92 S. Ct. 1526, 32 L. Ed. 2d 15 [1972], to hold that employers and unions may request corroboration of religious claims when sincerity is in question). Given this framework, employers have long been permitted to inquire into the religious nature or sincerity of an employee's belief when deciding on accommodations, provided there is an objective basis for the inquiry. See, e.g., *Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011) (inquiry into the sincerity and religious nature of a belief is permitted to determine

20

whether a duty to accommodate arises under Title VII); *Dockery v. Maryville Academy*, 379 F. Supp. 3d 704, 718-19 (N.D. Ill. 2019) (same); *Bushouse*, 164 F. Supp. 2d at 1075. This discretion is also reflected in the Equal Employment Opportunity Commission (EEOC) Compliance Manual—a formal interpretive publication of the federal agency charged with enforcing Title VII, which courts regularly treat as persuasive authority:

"3. Employer Inquiries into Religious Nature or Sincerity of Belief

"Because the definition of religion is broad and protects beliefs, observances, and practices with which the employer may be unfamiliar, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief. *If, however, an employee requests religious accommodation, and an employer has an objective basis for questioning either the religious nature or the sincerity of a particular belief, observance, or practice, the employer would be justified in seeking additional supporting information.*" (Emphasis added.) EEOC Compliance Manual § 12-I.A.3 (2021).

The second inquiry—undue hardship—serves as an additional safeguard for employers. In *Groff v. DeJoy*, 600 U.S. 447, 468-70, 143 S. Ct. 2279, 216 L. Ed. 2d 1041 (2023), the Court held that an undue hardship exists when the accommodation would result in "substantial increased costs in relation to the conduct of [the employer's] particular business." This protection ensures employers are not compelled to accommodate religious beliefs or practices at the expense of workplace safety, operational efficiency, or significant financial or administrative burden. Thus, an employer retains the right to establish, as a matter of law, that a requested accommodation would impose an undue hardship, and thereby decline the request without violating Title VII.

Relevant here, courts evaluate the reasonableness of accommodations and undue hardship based on the specific facts of each case, emphasizing bilateral cooperation and

meaningful efforts to resolve conflicts. See *Thomas v. Natl. Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 n.5 (10th Cir. 2000) ("The obligation to engage in an interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee.") (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 [10th Cir. 1999]). See also *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69, 107 S. Ct. 367, 93 L. Ed. 2d 305 (1986) (explaining that, consistent with the goals expressed in the legislative history of the religious accommodation provision, "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business").

C. *K.S.A. 2023 Supp. 44-663*

K.S.A. 2023 Supp. 44-663, enacted in response to federal vaccine mandates, provides that an "employer shall exempt an employee from [the COVID-19 vaccine] requirement . . . if the employee submits a written waiver request to the employer stating that complying with such requirement would . . . violate sincerely held religious beliefs of the employee . . . without inquiring into the sincerity of the employee's request." (Emphasis added.) K.S.A. 2023 Supp. 44-663(a)(2), (b). By its plain language, this provision removes, as a matter of law, the employer's ability to conduct the sincerity inquiry that Title VII expressly permits, even where the claimed belief appears implausible, inconsistent, or asserted in bad faith. More significantly, by mandating an automatic exemption, K.S.A. 2023 Supp. 44-663 deprives employers of the federal right under Title VII to engage in a meaningful interactive process for purposes of determining whether accommodating an employee's religious beliefs—even if sincerely held—would result in "undue hardship on the conduct of the employer's business." See 42 U.S.C. § 2000e(j).

This creates a direct tension between the federal and state regimes. Title VII's framework—as shaped by *Seeger*, *Bushouse*, and *Groff*—strikes a balance between

protecting employees' religious rights and safeguarding the employer's ability to maintain safe, efficient, and lawful operations. K.S.A. 2023 Supp. 44-663, by eliminating both the sincerity inquiry and the ability to deny accommodation based on undue hardship, upsets that balance and alters the substantive rights and defenses that federal law affords.

II. *Federal preemption*

Under the Supremacy Clause, federal law "shall be the supreme Law of the Land," and any conflicting state law is preempted. U.S. Const. art. VI, cl. 2. Courts recognize several forms of preemption. *Arizona v. United States*, 567 U.S. 387, 399-400, 132 S. Ct. 2492, 183 L. Ed. 2d 351 (2012). Express preemption occurs when Congress explicitly states its intent to preempt state law. Implied preemption occurs in two circumstances. The first is field preemption, where the federal regulation is so pervasive that it occupies an entire regulatory field. The second is conflict preemption, where the state law is incompatible with federal law. 567 U.S. at 399-400. This case involves conflict preemption.

Federal agency regulations can preempt state law if (1) they are validly issued pursuant to congressional authority and (2) a conflict exists. *Wyeth v. Levine*, 555 U.S. 555, 576, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009).

With the first requirement, the United States Supreme Court has held the CMS COVID-19 vaccine mandate is valid and enforceable as a legitimate exercise of the federal government's statutory authority. See *Biden v. Missouri*, 595 U.S. 87, 95-96, 142 S. Ct. 647, 211 L. Ed. 2d 433 (2022) ("We accordingly conclude that the Secretary did not exceed his statutory authority in requiring that, in order to remain eligible for Medicare and Medicaid dollars, the facilities covered by the interim rule must ensure that their employees be vaccinated against COVID-19.").

But even if a valid exercise of congressional authority, federal law may preempt state law only when the two conflict. Such a conflict exists where either "'compliance with both federal and state regulations is a physical impossibility'" or "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 399-400.

A. *Impossibility preemption.*

1. *Sincerity inquiry*

In accordance with the Vaccine Mandate and subsequent regulations, applicable providers were required to implement "a process by which staff may request an exemption . . . based on an applicable Federal law." 86 Fed. Reg. at 61,572 (later codified at 42 C.F.R. pts. 416, 418, 441, 460, 482-86, 491, and 494). This necessarily incorporates Title VII, including the possibility of denying religious exemptions due to insincerity. See *Seeger*, 380 U.S. at 185; *Yoder*, 406 U.S. at 215-16; *Vinning-El*, 657 F.3d at 594; *Dockery*, 379 F. Supp. 3d at 718-19; *Bushouse*, 164 F. Supp. 2d at 1075; EEOC Compliance Manual § 12-I.A.3.

But K.S.A. 2023 Supp. 44-663 forecloses the possibility of denying religious exemptions due to insincerity. By prohibiting any inquiry into sincerity, K.S.A. 2023 Supp. 44-663 removes this essential feature of the Title VII process, rendering compliance with both laws impossible. This is precisely the kind of direct conflict the Supreme Court recognized as preemptive in *Arizona*, 567 U.S. at 402-03 (In addition to field preemption, the Court found conflict preemption because the state law eliminated the possibility of probation or pardon for failing to carry registration papers while federal law permitted probation and the possibility of a pardon.).

24

The majority disagrees, concluding any conflict between federal law—which permits an employer to deny a religious exemption due to insincerity—and K.S.A. 2023 Supp. 44-663—which prohibits the employer from doing so—is illusory. The deciding factor for the majority in coming to this conclusion is that federal law merely permits an inquiry into religious sincerity—it does not require it. In other words, the majority believes there is no conflict because Powerback could comply with both laws by simply declining to assess sincerity.

It is hard to take seriously the suggestion that conflict preemption evaporates simply because Title VII "permits" rather than "require[s]" a sincerity inquiry. See *Powerback Rehabilitation v. Kansas Dept. of Labor*, 321 Kan. ___, ___, slip op. at 10. That reasoning effectively reads the employer's federally protected right out of existence. State law cannot nullify or forbid the exercise of a federally granted right, even if that right is discretionary rather than mandatory. The Supreme Court has recognized that preemption applies not only when federal law imposes affirmative obligations, but also when it preserves federal discretion as an integral part of the statutory scheme. *Arizona*, 567 U.S. at 402-03 (preempting state law that eliminated federal prosecutorial discretion, though federal law did not require its exercise in every case). Title VII's allowance for sincerity inquiries is not incidental—it reflects Congress' judgment that employers must retain the ability to evaluate claims where sincerity is legitimately in doubt. By categorically prohibiting such inquiries, Kansas law eliminates this substantive federal right and thus creates a direct conflict.

The flaw in the majority's view is that the absence of discretion is the conflict. Title VII and the CMS regulation incorporate the possibility—indeed the necessity in some circumstances—of denying exemptions based on insincerity. K.S.A. 2023 Supp. 44-663 strips those avenues away. This is not an "*illusory*" conflict; it is the precise kind of direct, irreconcilable conflict that triggers preemption. See *Arizona*, 567 U.S. at 402-03.

## 2. *Undue hardship*

The CMS regulation also incorporates an employer's right under Title VII to deny accommodation based on an employee's religious beliefs—even if sincerely held—if it would result in undue hardship on the conduct of the employer's business. By contrast, K.S.A. 2023 Supp. 44-663 requires an automatic exemption upon receipt of an employee's written assertion. This effectively eliminates the employer's ability to engage in a meaningful interactive process with the employee to determine the impact of the requested accommodation on the employer's business, up to and including circumstances where granting the exemption would force the employer to shut down operations altogether or drive the business into financial insolvency. The automatic exemption required under the statute deprives the employer of its federally recognized right to demonstrate that the requested accommodation—even if based on a sincerely held belief—would impose an "undue hardship on the conduct of the employer's business." See 42 U.S.C. § 2000e(j). The result is a direct tension between the federal and state regimes: Title VII creates a balanced framework that protects employees' religious rights while preserving employers' ability to protect workplace safety and operational integrity, whereas K.S.A. 2023 Supp. 44-663 mandates deference to the employee's statement alone, depriving employers of the federal law's built-in safeguards. This divergence is not merely procedural; it alters the substantive rights and defenses afforded under Title VII and recognized in federal caselaw.

## B. *Obstacle preemption*

Beyond the impossibility of compliance, K.S.A. 2023 Supp. 44-663 also fails under the second branch of conflict preemption: where a state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 399. Congress, through Title VII, struck a deliberate balance

between the protection of employees' religious exercise and the operational needs of employers. That balance is achieved through two integral safeguards: the ability of the employer to question sincerity where warranted, and the ability to deny accommodation where doing so would impose an undue hardship. These protections are not incidental—they are the mechanism by which Congress ensured that religious accommodation rights would coexist with legitimate business and safety imperatives.

K.S.A. 2023 Supp. 44-663 eliminates both safeguards. By mandating automatic exemptions without inquiry into sincerity and without regard to undue hardship, the Kansas statute effectively rewrites Title VII's framework into one of absolute deference to an employee's assertion. The result is not merely a different procedural pathway, but a fundamentally different substantive standard—one Congress explicitly rejected when it conditioned accommodation on reasonableness and balanced it against undue hardship. See 42 U.S.C. § 2000e(j); *Groff*, 600 U.S. at 468.

This is precisely the kind of statutory interference that *Arizona v. United States* forbids. Just as the Court there held that state law cannot supplant federal discretion with a more rigid regime, here Kansas law disables the federally recognized mechanisms by which employers are permitted to protect their business operations. The state statute therefore frustrates the objectives of Congress by removing the careful equilibrium that Title VII establishes, leaving employers exposed to mandatory accommodations regardless of sincerity or hardship. Because it obstructs the federal statutory scheme and undermines its core purposes, K.S.A. 2023 Supp. 44-663 is preempted under the Supremacy Clause.

CONCLUSION

The Supremacy Clause ensures uniformity where Congress has spoken with unmistakable clarity. Title VII embodies a carefully calibrated framework, one that

27

protects religious exercise while preserving the ability of employers to safeguard legitimate operational and safety interests. K.S.A. 2023 Supp. 44-663 is incompatible with that framework in two respects. It makes compliance with both state and federal law impossible, and it obstructs the objectives of Congress by replacing a balanced system with one of absolute deference. Either defect alone is sufficient for preemption; together, they leave no room for doubt. Because Kansas has attempted to supplant federal law with a contradictory regime, I would hold K.S.A. 2023 Supp. 44-663 is preempted by the Supremacy Clause.

ROSEN, J., joins the foregoing dissenting opinion.